[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE INJUNCTIONS
By Petition, Application and Verified Complaint dated August 12, 1992, plaintiffs, Philip A. Wilde, Jr. ("Wilde") and H. Richmond Woods, Jr. ("Woods") brought this action against defendants, Richard M. Traskos ("Traskos"), Samuel D. Crum, Jr. ("Crum") and Kirk R. Thornton ("Thornton").
On August 12, 1992, plaintiffs were granted an ex parte temporary injunction restraining the defendants as directors of Allen, Russell Allen, Inc. ("ARA"), from voting to terminate Wilde's employment and from issuing any additional stock in ARA. This injunction was specifically directed to a special ARA Board of Directors meeting that had been scheduled for the following day, August 13, 1992.
On August 13, 1992, defendants presented to the court their Verified Counterclaim and supporting documents seeking temporary and permanent injunctive relief against the plaintiffs in regard to a special substitute annual meeting of the shareholders of ARA that had been noticed for the following Monday, August 17, 1992.
The court scheduled a hearing on both for August 14, 1992. The hearing ended August 21, 1992.
Facts
ARA is a Connecticut corporation and is a licensed independent insurance agent. Its income is primarily insurance commissions.
ARA was formed on August 31, 1964 to create a simplified organizational structure for Allen, Russell Allen, a partnership; Fred H. Williams and Company, a partnership; Fred H. Williams and Company, Inc., a Connecticut corporation; and Allen, Russell Allen, Inc., a New York corporation, all of which, had been related entities each conducting an insurance agency business. The form and structure of that reorganization was the subject of considerable discussion prior to September 1964 when the plan was implemented. The minutes of the First Meeting of the Board and the First Meeting of the Corporation both contain the following description of the purposes for which the corporation was organized:
CT Page 8450 It was stated that the corporation had been organized to create a simplified organizational structure for Allen, Russell Allen and the several entities related to it and to simplify accounting and record keeping functions of these entities, to provide a practical means for admitting new principals and for giving them a stake in future growth at low initial cost and to provide a means of retiring the financial interest of each retiring principal.
ARA had twelve original shareholders, including Wilde. Wilde then was issued 787 shares of common stock and 487 of Class A preferred stock.
The first meeting of the ARA was held on September 1, 1964, and the By-Laws were adopted.
At this same meeting the following individuals were elected Directors of Allen:
 Thomas F. Oakes H. T. Messenger H. A. Dewing, Jr. C. S. Merrill D. P. Bogino B. D. Flynn, Jr. P. A. Wilde, Jr. W. Kennedy H. A. Walker, Jr. E. C. Alger Frank Chapman C. W. Cody (sic, should be Cady)
It was also voted to authorize the board of directors ("Board") to issue shares of each class of stock as authorized by the certificate of incorporation.
There are three types of authorized stock, Common, Class A Preferred, and Class B Preferred. The Class B Preferred stock has never been issued and has no bearing on this case. Neither the Common nor the Class A Preferred stock has ever paid any dividends.
The first meeting of the Board was held on September 1, 1964, and common stock was issued to all the Directors, except Frank Chapman ("Chapman"), who was the corporation's attorney. Class A Preferred stock was issued to some of the directors. Common stock was also issued to two persons who CT Page 8451 were not Directors as follows:
 B.R. Sheridan ("Sheridan") 609 shares N.C. Vose ("Vose") 559 shares
Vose has performed the function of bookkeeper since 1964. He is now a consultant to ARA. He retired at age 72 and, then tendered his shares to ARA and was paid book value.
In 1964, all shareholders except Bogino entered into identical stock purchase agreements ("SPA"). SPA's have been amended over the years but none of those amendments is relevant to this case. Paragraphs 2, 3 and 5 of the SPAs generally read as follows:
 2. The Stockholder will not, during his life, sell any of the common stock, Class A Preferred and Class B Preferred of the Corporation which he may now own or hereafter acquire to any purchaser except the Corporation, provided, however, that he may sell all or any part thereof to any one or more of the remaining stockholders of the Corporation at any time with the consent of the Corporation and all of the remaining stockholders.
 3. If the active employment of a Stockholder is terminated for any reason other than his death, he will within thirty (30) days after such termination assign to the Corporation all shares of the common stock and Class A Preferred Stock of the Corporation held by him. At its option the Corporation may pay the Stockholder cash for the stock so assigned or it may issue Class B Preferred Stock in exchange therefor. The amount of the cash payment or the par value of the Class B Preferred shall be equal to the par value of the Class A Preferred so assigned plus the book value of the Common Stock. The Corporation and the Stockholder may agree to use the last quarterly audit of the Corporation's books prior to the Stockholder's termination of active employment. Failing such agreement, the book value of the common stock shall be determined by an audit of the Corporation's books by the Corporation's regular accountant as of the CT Page 8452 date the Stockholder terminated his active employment. If the Corporation makes payment to the Stockholder in cash, the Corporation may at its option make payments in equal installments over a period of up to five (5) years beginning with the date of termination of employment with interest payment quarterly on the unpaid balance at the annual rate of five per cent (5%).
 5. The Stockholder agrees that he or his personal representative will do any and all things necessary or appropriate for him to do to carry out the assignments described herein. Further that on any question presented to the stockholders dealing with the payment, the Stockholder or his personal representative will vote his shares in the Corporation in the same way that the majority of the remaining stockholders have voted their shares on the question.
 In addition to the transfer restrictions contained in the SPAs, the By-Laws in Article II, Section 2 provide as follows:
 Section 2. Transfer of Stock. Shares of stock shall be transferred only on the books of the Corporation by the holder thereof in person or by his attorney, upon surrender of the certificate of stock properly endorsed. Shares of stock shall not be transferred in contravention of any agreement between the Shareholder and the Corporation and/or other Shareholders of the Corporation. In the absence of any such agreement a Shareholder shall give the Corporation thirty days' advance written notice of his intention to dispose of such shares and the Corporation shall have an option for such period to purchase such shares at their book value as of the last completed quarterly period of the Corporation's fiscal year as determined by the Corporation's regular independent accountant.
There are about 28 employees in ARA including the five parties in this action.
CT Page 8453 Woods has been an employee since 1966 and as of August 12, 1992 was both Secretary and a Director. He first purchased Common stock in ARA in 1970 but he was not elected a Director until May 22, 1975. He stayed on the Board until June 1981 when he was not re-elected. He was not a director from June 18, 1981 to July 16, 1984 when, he was re-elected to the Board. Since December of 1988 he has owned 400 shares.
During some time over the past 10 years, both Traskos and Crum have been shareholders but were not on the Board. (Traskos, p. 27; Exhibits JJ, KK.)
Traskos first purchased Common stock in November of 1981 but, despite several attempts which were blocked by the majority shareholders, Mr. Wilde and Mr. Merrill, he was not elected to the Board until September 12, 1985.
Crum first purchased Common stock in November of 1986 but was not elected to the Board until June 28, 1988.
All of the shareholders had knowledge at the time they became shareholders that stock ownership did not confer any right to membership on the Board. The defendants knew, prior to December 1988, that a majority vote of the shareholders controlled the election to the Board.
Wilde became both a shareholder and a Director at or near its inception in 1964. As most of the shareholders have done, Wilde entered into a Stock Purchase Agreement ("SPA") with ARA when he purchased his stock in 1964.
Woods entered into a SPA with ARA when he first purchased stock in 1970.
Since September 22, 1964, Wilde's SPA has been amended by agreement between Wilde and the Board three times; in 1970, 1976, and 1987.
Since Woods became a shareholder his SPA has been amended by agreement between him and the Board twice; in 1976 and 1987.
Chapman was a Director from the inception in 1964 until June 18, 1981 but never a shareholder. As a Director, Chapman voted for two Amendments to SPA; an Amendment in 1970 and an Amendment in 1976. There is no evidence that unanimous shareholder votes were required for the approval of these Amendments.
A 1987 amendment to a SPA was approved-by the Board CT Page 8454 at the Regular Board Meeting of September 17, 1987. A unanimous shareholder vote was not sought by the Board for this 1987 Amendment.
A unanimous Board vote was not equivalent to a unanimous shareholder vote because Crum, who had been offered shares in November of 1986 but was not on the Board until June 28, 1988, did not have the opportunity to vote on this Amendment.
At least one shareholder, Bogino, did not sign a SPA, but had a separate employment agreement which obligated ARA to buy his Common stock for fair market value instead of book value as provided by the other SPAs. Bogino left ARA on June 1, 1972, and took with him certain accounts that he had serviced while an employee and Director. He set up his own agency in competition with ARA.
Wilde entered into an Employment Agreement on September 1, 1964. Under this Employment Agreement, Wilde is entitled to specified retirement benefits under the ". . . qualified retirement plan upon his normal retirement." Wilde's Employment Agreement does not define by age or any other means the term "normal retirement".
In October of 1987, Benedict Flynn had been an employee, shareholder, and Director of ARA since its inception in 1964 and was 68 years old.
At a regular meeting of the Board on October 19, 1987, the Board passed the following resolution ("1987 Board Resolution"):
 . . . Officers and/or Directors, upon reaching age 64, will begin the transfer of risks handled to associates, transfer to be completed by age 65. Also, at age 65, the Director and/or Officer will terminate all management responsibilities.
 Any Officer or Director age 65 or over as of October 19, 1987 shall begin immediately the transfer of risks handled to associates, such transfer to be completed by June 30, 1988, on which latter date retirement will be effective.
The Minutes of the meeting of the Board on October 19, 1987 do not mention Wilde's or any other Director's Employment Agreement or SPA. There is no evidence that the SPAs CT Page 8455 were discussed at that meeting.
Although several of ARA's employees have management responsibilities, there are many employees who have no management responsibilities. To be an effective producer at ARA, it is not necessary to have management responsibilities. For example, Mr. Mikkelson and Mr. Rado are big producers and have no management responsibilities. Two other employees with no management responsibilities are Mrs. Cooper and Mr. Wilde's "account handler".
Despite his management responsibilities, Wilde spends most of his working hours soliciting new business or servicing existing clients.
Woods spends ninety percent of his working time selling and servicing business. The insurance agency business, is essentially a service and sales business and management responsibilities are limited.
That paragraph in the October 19, 1987 Resolution beginning "Any officer . . ." referred to Mr. Flynn who was the only Director over age 65 on that day. Mr. Flynn retired at age 69 on June 30, 1988.
No other Director of ARA has retired since October 19, 1987.
Wilde turned 65 on September 22, 1990, between September 22, 1990 and the spring of 1992.
No Director, officer or employee of ARA has brought the 1987 Board Resolution to his attention since that date until the start of this action.
Between September 22, 1990, when Wilde turned 65, and the spring of 1992, no Director told Wilde that he must retire because it was required under the 1987 Resolution.
Between September 22, 1990 and August 10, 1992, the defendants took no action to enforce any "retirement policy" of ARA.
Traskos felt that the Board desired to work with Wilde toward an orderly transition and retirement, and that the Board did not want to put him out "the day after his sixty-fifth birthday." Traskos felt that the Board "had no reason to invoke the [retirement] policy."
Crum stood to receive some benefit from a delay in CT Page 8456 Wilde's retirement because if Wilde retired after Woods, Wilde was expected to vote for Crum as the new President, whereas if Wilde retired before Woods, it was expected that Woods would vote with Traskos to name Traskos the new President.
In December 1988, or prior, defendants approached Wilde to request that each defendant receive one hundred (100) additional shares so that they would hold collectively six hundred (600) shares, a majority of the shares, if "something happened to Wilde." That was done.
Although Wilde has mentioned several possible retirement dates to various members of the Board at various times since October 19, 1987, he has never set a "firm retirement date"; his retirement date was a "moving target."
At one point between October 19, 1987 and the trial, Wilde said to various directors that his retirement was "conditional" upon Woods retiring first.
Woods will turn 65 on October 4, 1992.
During 1991 and 1992, ARA's financial condition has steadily deteriorated. By early January of 1992, all the shareholders and directors knew that ARA has sustained a substantial loss in 1991.
Beginning in September of 1991, the directors had numerous discussions at Board meetings about ways to improve ARA's financial condition, including increasing production of new accounts, intensified efforts to collect accounts receivable, and cutting expenses, including reducing Directors' salaries. As of December 31, 1991, ARA's liabilities exceeded its assets by $46,232.00.
All the shareholders expect an operating loss in 1992. As of July, 1992, Thornton estimated a loss in the amount of $78,000.00. For purposes of 33-358 of the General Statutes, ARA is insolvent as that term is defined by 33-284 (1) of the General Statutes.
As of December 31, 1991, the financial statements showed shareholders with a deficit of $46,132.00 and a negative book value of $23.10 per Common share.
Beginning in 1991, Wilde suggested four possible solutions to the financial predicament at meetings with directors as follows:
a. seek a merger with a national brokerage house; CT Page 8457 b. seek a merger with a local agency; c. seek an outside investor; or d. go along as is.
The parties have stipulated for the limited purpose of this proceeding only, to the following fact:
 "Under appropriate circumstances and subject to the requirements of the Connecticut General Statutes, a capital surplus can be created on the balance sheet of a corporation through the sale of treasury stock and/or through the issuance of authorized but unissued common and preferred stock."
On June 3, 1992, Wilde was contacted by Mr. Norman Kayser ("Kayser"), President of R. C. Knox and Company, Inc. ("Knox"), about the possibility of some connection between ARA and Knox.
On June 24, 1992 and July 16, 1992, Wilde and Kayser met to discuss a possible combination of ARA and Knox.
On the evening of July 27, 1992, Wilde first received a written "conceptual plan" from Kayser.
On July 31, 1992, Wilde called an informal meeting of the Board and read virtually all of that conceptual plan to the full Board. It was there agreed that a shareholders' meeting would be held on August 17, 1992.
Since approximately January 1, 1990, the identity of the shareholders and the amount of stock each shareholder has owned has remained constant. These amounts have been and continue to be as follows:
 Shares of Total Shares of Class A Shares Shareholder Common Stock Preferred Stock Held Philip A. Wilde, Jr. 1,212 487 1,699 H. Richmond Woods, Jr. 400 0 400 Richard M. Traskos 200 0 200 Samuel D. Crum, Jr. 200 0 200 Kirk R. Thornton 200 0 200
Since approximately January 1, 1990, the percentages of stock ownership have been as follows:
Percent ownership Percent ownership CT Page 8458 of of Class A Shareholder Common Stock Preferred Stock Philip A. Wilde, Jr. 54.79% 100% H. Richmond Woods, Jr. 18.08% 0% Richard M. Traskos 9.04% 0% Samuel D. Crum, Jr. 9.04% 0% Kirk R. Thornton 9.04% 0%
On August 5, 1992, Woods had his secretary, Susan Greely, mail Notice of a Substitute Annual Meeting of shareholders to be held at 2:00 p. m. August 17, 1992, to Wilde, Traskos, Crum, and Thornton. Said notice stated that there would be "consideration of the future of the firm including a possible consolidation or merger."
On August 10, 1992, Wilde and Woods were served with Notice of a Special Meeting of the Board, stating that a Board meeting would be held on August 13, 1992 at 9:30 a.m. to discuss, among other subjects, termination of the employment of Wilde.
The reason for wanting to terminate Wilde's employment at this proposed August 13, 1992 meeting was to prevent any kind of proposal from Knox being considered.
On August 13, 1992, that Board meeting was held and action was taken to terminate Wilde as President and Treasurer and Woods as Senior Vice-President and Secretary. At that meeting the only reason given for the action to terminate Wilde as President and Treasurer was his age.
On August 17, 1992, the duly noticed Substitute Annual Meeting of ARA's shareholders was held. At that meeting it was resolved that discussion of the future of the corporation, including any possible consolidation or merger, be postponed until further notice.
Conclusions
This case is before the court as an application for a temporary injunction. The four legs of the chair supporting a temporary injunction are proof of: (1) irreparable injury; (2) no adequate remedy at law; (3) probability of success in the final analysis; and (4) that upon a balancing of all the equities the application prevails. The court has already ruled that numbers (1) and (2) have been proven as to both the plaintiffs and the defendants.
As with many small corporations, not all was done with Euclidian precision. Not all the dreams of the founders CT Page 8459 are known. Whether and how those dreams were supplemented, reinforced or corrected over the last 28 years was not recorded for the corporation, the contractors or the court.
If all shareholders are essentially equal why do some have more shares than others? Not for dividends; that would be a financial error under the internal revenue code. Possibly for the stock repurchase. But that being "at book" is not a terribly compelling reason.
If all shareholders are essentially equal why do we have two kinds of issued stock?
If the pension and profit sharing systems in place are the only retirement devices why do we have added stock distributions to shareholders, e.g. to each of the five parties plus Vose?
If being a shareholder is to be the functional equivalent of being a director why do we have a history of a director who was never a shareholder (Chapman) and shareholders who were not directors for periods of time when they were shareholders; (Vose, Crum and Woods)?
For the purpose of this application, in spite of the trail of little factual breadcrumbs that might lead to some kind of casual partnership; a kindly oligarchy; or a de facto corporation of some other type, this court treats ARA as a duly existing Connecticut stock corporation under Chapter 599 of the Connecticut General Statutes.
The SPA may not be amended unilaterally by the corporation. Thus, the Board resolution of October 19, 1987 alone does not add an age date to the SPAs. In addition, the resolution does not provide for retirement of employees but only that officers and directors age 65 or over will terminate all management responsibilities and transfer risks. That is not retirement. The second paragraph of the resolution refers only to Flynn. It speaks of retirement.
The shareholders meeting of August 17, 1992 elected some new directors. The three defendants were not re-elected as directors and are not now directors. Subject to the court's order herein, the directors may operate the corporation as they see fit in accordance with the statutes, the certificate of incorporation, and the by-laws, subject to the constraints of all corporate obligations.
The Board at its meeting of August 13, 1992 had no basis for firing Wilde and Woods. Wilde is still an employee CT Page 8460 and a director. Woods is still an employee and a director.
The shareholders meeting of August 17, 1992 was valid.
The court finds that plaintiffs will probably prevail. The court finds in a very complicated balancing of the equities that it is quite clear the law should aid the plaintiffs.
Order
Until a final hearing on this matter is had and a final judgment is issued, the Board shall not issue any stock; fire any defendant, except for cause; amend any by-law; enter into any final merger or consolidation agreement; enter into an agreement for a sale of corporate assets under Conn. Gen. Stat. 33-372; or make any "fundamental changes" in the corporation. The Board shall not add to the present number of directors.
The Board and its agents may negotiate with other parties about fundamental changes and discuss fundamental changes but may not bind the corporation.
NORRIS L. O'NEILL JUDGE, SUPERIOR COURT